ALLIANCE SECURITIES CO. v. DE VILBISS CO.

District Court, N. D. Ohio, W. D. February 29, 1928.

No. 735.

1. Patents ⊕⟿327(14)—Manufacturer taking over defense of infrngement action against customers held bound by decision of infringement.

The manufacturer of an article having taken over the defense of patent infringement action against its customers *held* bound by the decision that the article was an infringement.

2. Patents ⊕⟿328—1,196,691, for improvement in means for distributing liquors, held not infringed.

Hopkins patent, No. 1,196,691, for improvement in means for distributing liquids, *held* not infringed by De Vilbiss structures 2 and 3, they not having the two automatic pressure valves, one in each of the two branch lines to the spraying nozzle, necessary to make the patented device an advance in the art.

3. Patents ⊕⟿165(2)—Patent is not given wider application than claimed for it as inducement to its issue.

Patent is not given a wider application after issue than that claimed for it as an inducement to its issue.

4. Patents ⊕⟿289(2)—Under circumstances, delay in bringing infringement suit held laches barring right to accounting.

Delay of years in bringing suit for infringement of patent during which defendant to patentee's knowledge was openly and extensively, and against great opposition, engaged in creating a field for devices of that nature, includ-

ing the infringing device, *held* laches, barring right to accounting.

**5. Trade-marks and trade-names and unfair competition ⬳68(1)—Propaganda through press and by letters to competitor's customers, misrepresenting, to competitor's damage, scope of patent infringement decisions, held actionable unfair competition.**

Propaganda for which patentee was responsible through press and by letters to competitor's customers, misrepresenting to competitor's damage scope of decisions in patent infringement cases, whether maliciously instituted or the product of bad judgment, *held* actionable unfair competition.

In Equity. Action by the Alliance Securities Company against the De Vilbiss Company. Bill dismissed, and accounting on counterclaim ordered.

This is an action by the Alliance Securities Company against the De Vilbiss Company, charging defendant with infringement of the Hopkins patent, No. 1,196,691, for improvement in means for distributing liquids, pleading an adjudication thereof in the Northern District of California. Alliance Securities Co. v. J. A. Mohr & Son (D. C.) 14 F.(2d) 793, affirmed (C. C. A.) 14 F.(2d) 799. The bill alleges that the defendant took over the defense of the cases in California and became bound by the decision thereof, but that it has continued to infringe, particularly in the manufacture, since 1924, of structures known to the record as devices Nos. 2 and 3. An accounting is also demanded, both an account of the manufacture and sale of the device considered by the California courts, known in this case as defendant's No. 1, and also of devices 2 and 3.

The answer denies the validity of the patent, asserts that defendant's devices 2 and 3 were not before the courts in California, which defendant alleges considered only its device No. 1, manufactured prior to 1925; and that the Hopkins patent does not, by its terms and the conditions of its grant, embrace devices Nos. 2 and 3. An issue is also raised by answer whether the defendant is bound by the decree in California. Delay in enforcing the Hopkins patent, which was granted August 29, 1916, is pleaded for laches, as a defense against any accounting for defendant's manufacture and sale of its device No. 1, even if defendant is bound by the decree in California, in which action was brought late in 1924. Want of equity is also pleaded defensively against plaintiff for its alleged misuse, amounting to unfair competition, of the decree in California, in the form of alleged misrepresentations of the

scope thereof, with specific warnings that such devices as defendant's 2 and 3 were within the effect of the California decisions. These were not only publicly issued, but also directed specifically against the defendant and its customers.

A counterclaim is set up and insisted upon against the plaintiff, seeking an injunction to restrain a continuation of the alleged unfair competition, and for an accounting for damages claimed to have been sustained by the defendant, because of plaintiff's conduct.

Other facts will be found stated in the opinion.

Darby & Darby, of New York City (Samuel E. Darby, of New York City, of counsel), for plaintiff.

Owen & Owen, of Toledo, Ohio (Wilber Owen, and Charles W. Owen, both of Toledo, Ohio, of counsel), for defendant.

KILLITS, District Judge (after stating the facts as above). In our opinion a determination of the issue of infringement raised by the pleadings requires but a few simple deductions from the record, principally from the terms of the Hopkins patent and the history of its prosecution shown in the file wrapper contents.

[1] So far as this case is concerned, we are not now privileged to go into the general question of validity of the Hopkins patent; for we find from the record that the defendant here, the De Vilbiss Manufacturing Company, became so connected with the defense in actions brought by the present plaintiff in the District Court of the Northern District of California against J. A. Mohr & Sons and the Standard Oil Company, that the decisions in those cases (14 F.[2d] 793, 800, inclusive) bind it respecting structures manufactured by it prior to 1925. A careful examination of those cases, however, leads to the clear conclusion that neither involved nor brought about an adjudication of the question whether infringement of the Hopkins patent (1,196,691) here sued on was occasioned by defendant in the instant case in its manufactures subsequent to 1924, and represented by defendant's structures Nos. 2 and 3, of which plaintiff complains in this action. Indeed, these structures were not before the western court in either case. No manufacture and sale of either was begun until after the Mohr and Standard Oil Cases were under way.

We wish our position to be made clear to the end that it may not be said that in any degree does this court either adopt or reject the decision of the California court respect-

ing validity of the Hopkins patent. We take that matter as closed here only as affecting defendant's earlier manufacture, against which the California actions were directed, and because of the relation to those cases charged to the defendant by the California courts. In effect, therefore, the parties here are the same as in the western cases. Were the circumstances otherwise, we would, of course, resort to the California decisions as aids in elucidating the question at issue, and not decisive thereof, leaving us free to our own conclusions as to the force of the prior art, and possibly to give a different effect thereto, according to whatever judgment we should reach.

Collings and Weatherhead patent, No. 412,875, shows a combination of elements which is in apparent anticipation of the Hopkins specifications, and was urged as an effective defense in the California cases. It, however, is a device for spraying fuel oil into a furnace, and was discarded by the courts as a pertinent anticipation in the Mohr and Standard Oil Cases, on the theory that the arts of spraying fuel oil and of spraying paint were not analogous. Those courts, however, did not have before them a patent brought to our attention (Bryce, No. 520,766) whose specifications declare such analogy to exist. Bryce's invention was a device offered as effective to "spray fine dry solids, or liquids, or both, by the force of dry vapor" and applicable to "mechanical painting" or to "inject, under air or other vapor pressure, solid and liquid fuel into a furnace."

Were, therefore, the question of validity open between the parties to this case, we would have the liberty, now denied us by the California cases, to consider the function of the Bryce disclosure, not present to them, and also, possibly, our discussion of a somewhat similar question of analogy in the matter of the Painter patent, No. 638,354. Crown Cork & Seal Co. v. Sterling Cork & Seal Co. (D. C.) 210 F. 26, 31, affirmed as to the decided invalidity of the Painter patent (C. C. A.) 217 F. 381. In such a possible reconsideration of validity, the position in the prior art of Collings and Weatherhead might become more important.

[2, 3] Coming now to plaintiff's claim that defendant's structures 2 and 3 infringe the Hopkins patent, granted August 29, 1916, No. 1,196,691, it is unnecessary to enter an extensive discussion of the state of the art when the application was made for alleged improvements in "means for distributing liquids." This was rejected at first by the primary examiners on Fisher, No. 584,864, and Quest et al., No. 627,877. Upon rehearing, and noting the emphasis placed by Hopkins and his counsel upon the feature of two automatic pressure valves, one in each of two branch lines to the spraying nozzle, which was pressed as the essence of the alleged invention, claim 1 was allowed, other claims being rejected, and that action sustained by a majority of the general examiners on the theory of equivalency of automatic regulators with hand valves shown in the prior art. As will be noted later, the commissioner sustained these claims, but not to enlarge the scope of the invention beyond that urged by applicant as the reason for reconsideration of the primary rejection on Fisher and Quest, resulting in the allowance of claim 1. That the commissioner viewed this as availing yet but a slight and special advance in the art, limited to a certain specified construction, is shown by this quotation from his opinion:

"Applicant's apparatus differs from the prior art in using two automatic valves, one between the supply of compressed air of the paint tank, and the other in the branch conducting the air to the nozzle."

Nowhere may it be said that the effect of the prior art, which made the limitations on the first claim acceptable as inventions, was not equally applicable to the remaining claims which the commissioner approved.

Not only did this Hopkins patent gain allowance upon final appeal because of the distinction from the prior art noted by the commissioner above quoted, but repeatedly in specification, argument before the examiners from the beginning, and briefing on the appeals, was that emphasized as the sole criterion of patentability. Invention, it was claimed in varying terms, lay only, but decidedly, in the fact that Hopkins employed two automatic valves, definitely located in the two branches from the air supply line, which were capable of independent adjustment and operation; one regulating the pressure upon the liquid in the paint container, and the other in the air line leading to the nozzle, where the branches came together and the pressures co-operated in producing a satisfactory spray upon the object to be painted. In neither of the defendant's structures involved in this action is there such construction, nor one which will accomplish the result which Hopkins claims, in his application and its prosecution, is peculiar to his invention. The defendant has, of course, the two branch lines which are necessary to a successful apparatus, and which were old in the art; but one of these, however—that into the

paint container only—is equipped with a pressure regulator; the other carrying to the nozzle, to effect the spraying, only air under the pressure raised in the common source of supply. These constructions therefore, in our judgment, are nothing more than those advised by the art as old before Hopkins' alleged invention; for it was old in the art and a matter of common use, in fact essential to the successful working of any apparatus, including the Hopkins construction, that the source of supply should be from air under pressure. The Hopkins patent speaks of "a suitable source of supply" as fundamental to the working of his invention, and he says that that means a supply of air under regulated pressure—an old combination element, one which he himself had used prior to his invention.

It is quite apparent, considering the history of the Hopkins application and the ideas of the inventor as to what that consisted of, given in his specifications and in his testimony prior to becoming a witness in the instant case, and, indeed, in some of his admissions before us in cross-examination, also by the consideration given to the field of the invention throughout the prosecution of the application, by his counsel in argument, and by examiners and the commissioner, that he is now making claims for the scope of his invention which not only would not have been listened to in the Patent Office, but which, if they had been pressed as essential, would have resulted in rejection. It seems very clear that they would not have appealed to the commissioner, as they do not appeal to us. In claim 1 he speaks of one of the elements of combination as "independent controllable reducing means interposed in each of the branch air supply pipes permitting the variation of air pressure in either of said branch pipes without affecting the pressure in the other"; and the same idea, in other wording, as essential to the invention, is carried into each of the other claims, as it must have been to discriminate this alleged invention from the prior art, and as dwelt upon as essential in the specifications. Now he would have this language construed to mean separately controlled regulatory apparatus, wherever located, and whatever may be the effect of such apparatus, whether it produces the result which he claims distinguishes his invention as an improvement or not. This is decidedly a new position for Hopkins to take, inconsistent with that held by him in the Patent Office, and one with which we cannot agree.

Much space could be employed in quotations from the prosecution record fastening upon Hopkins a claim for the field of his invention, and put forth plainly to induce favorable action, which, if he is held to it here, defeats plaintiff's right of action for infringement by defendant's structures 2 and 3. It is not necessary to do more than to sum up their effect, which is to limit the invention to an apparatus which is equipped with an automatic pressure valve in each of the two branch lines from the sources of air supply which are common and necessary to all paint-spraying machines. It was this construction distinction, and it only, which caught the mind of the commissioner, as shown not only by the quotation from his opinion above given, but by the context from which it is taken. The commissioner sustained the appeal, and allowed the disputed claims, because he found that the two automatic pressure regulations, one in each branch line, were not anticipated by a showing of hand-operated pressure valves in the prior art. It has long been settled that a patent cannot be given a wider application after issue than that claimed for it as an inducement to its issue.

De Vilbiss structures 2 and 3 do not have the features which only made the Hopkins application issuable, and our conclusion must be that, as to the alleged infringement of defendant's structures 2 and 3, the issue is against the plaintiff; that no infringement is present in either.

The predecessor of the defendant company was a pioneer in the development of paint-spraying apparatus, and had entered the field of manufacture thereof long before the Hopkins application. The proof here shows that the defendant and its predecessor had carried for several years a large burden in the development of paint-spraying apparatus to the satisfaction of the trade, and in meeting many obstacles in the shape of opposition from labor organizations and otherwise to the general use of such apparatus; expending therefor very large sums of money, the benefit of which expenditure and the defendant's efforts not only inured to it, but to every other manufacturer of such apparatus, including Hopkins and his assignee, the present plaintiff. Its position when Hopkins and his assignee entered the field was one of pre-eminence in the art, and it was notoriously most active in the manufacture and sale of apparatus of various structures, including that directly involved in the California cases, for years before those actions were begun—a circumstance which, in connection with others, we regard as of consid-

erable importance in the consideration and determination of other issues in this case.

[4] One of the objects of the bill, and based upon the decisions of the California courts which bind the defendant, as we have said, in this particular, is for an accounting for defendant's infringements as determined by the California court in the manufacture and sale of its structures exploited prior to 1925, namely, defendant's structure known here as No. 1. In defense of this part of the case, it is urged upon the facts pleaded and shown in testimony that plaintiff has been guilty of such laches as that this much of its complaint should not be entertained. Briefly, we are shown in testimony that a minimum activity in the manufacture and sale of the Hopkins device was engaged in by Hopkins and the plaintiff, his assignee, during the years 1913, 1914, and 1915, and prior to the application and pending the application, and also subsequent to the issuing of the patent to about the time of the commencement of this action, almost limited, in fact, to the use of the Hopkins structure by Hopkins himself, and continuing in this obscure and feeble exploitation during the period when defendant was openly and extensively engaged in creating a field for modern paint-spraying devices against great opposition, and involving defendant in large expense, so notoriously extended as to reach the location of Hopkins' business where a very large part of defendant's endeavors for the benefit of the paint-spraying art generally, including the Hopkins interests, were carried on. It is shown that, for at least three years prior to the beginning of the California suits, what the defendant was doing in manufacture and otherwise was well known to the Hopkins interests. It is urged, upon these facts, that no excuse is shown why the Hopkins interests should have delayed until some time in 1924, and then brought, not where reasonably indicated against its principal (defendant here), but against its customers in a distant state, the actions which found defendant's structure No. 1 to be infringement. We find ourselves in hearty sympathy with the defense of laches against plaintiff's demand for an accounting for the manufacture held by the California courts to be infringement. We regard it as highly inequitable, under all the circumstances shown here, to permit the plaintiff to have an accounting against the defendant for the latter's infringement in the marketing of its device No. 1.

We had a similar question before us some years ago (General Electric Co. v. Yost Electric Co. [D. C.] 208 F. 719), where it was held that the defense of laches was not tested alone by the length of time in which the alleged infringer was unmolested in his attacked activities, but that other circumstances exhibited in the case under consideration affected the question perhaps more importantly. The opinion cites many cases, which need no recitation here. On the immediate issue, later important cases are Mosler v. Lurie (C. C. A.) 209 F. 364, and Simpson v. Newport News Shipbuilding & Dry Dock Co. (D. C.) 18 F.(2d) 318, affirmed (C. C. A.) 18 F.(2d) 325.

We are strengthened in this opinion by a consideration of certain other facts which are more directly pertinent to a third issue in this case, and which invokes the application of the maxim that he who seeks equity must do equity. We therefore sustain defendant's plea of laches as a good defense against an accounting for the infringement decided in California.

[5] In the complaint it is alleged that the Hopkins patent has been the subject of litigation in various suits in the Southern Division of the United States District Court for the Northern District of California, and six decrees reached in favor of the plaintiff in as many cases are pleaded. Four of these cases were against customers of the defendant here, two of which have already been alluded to. In them there was a real contest. In two, however, those against the Rix Compressed Air & Drill Company and Lacer & Green were not contested patent suits at all, but plainly and unmistakably consent decrees, in which the not unusual effort was made to secure an apparent adjudication of the validity of the patent by what amounts to a collusion between the apparently contesting parties. Upon the obtaining of these decrees, starting with the not contested decisions, and subsequently including the cases reported in 14 F.(2d), supra, a very vigorous propaganda campaign, favorable to the plaintiff and disastrous to the business of the defendant, began in the newspapers in discussing the Hopkins victories, and in plaintiff's private correspondence with defendant's customers and in general advertisements and notices to the trade, which had the obvious effect, plainly intended by those responsible for it, to create the impression in the paint-spraying trade that the Hopkins patent was so comprehensive in its force as to subordinate to it all apparatus having the features of the present manufactures of the defendant shown in its structures known in this case as 2 and 3. In other words, the effect

of the contested adjudications in California was put forth as much broader than was justified, or intended, we are sure, by the courts rendering them, while the noncontested decrees were used for their full apparent effect. This is not an unusual procedure in competition of this character, and no court will sustain it or regard it as anything but unfair competition, actionable against its authors. That it must have had a very depressing effect upon defendant's business, legitimate after 1924 in spite of the California decisions, is clearly indicated by the character of this propaganda; and, if those responsible therefor can be found, we are clear that the defendant has a right of action.

Charging responsibility for this to plaintiff, defendant prosecutes a counterclaim for damages. Defending against this, plaintiff, while not supporting the propaganda as fair, for that could not be done, insists that it had no part in puttting it out, nor encouraged it either directly or indirectly. An examination of the facts before us, however, leads us to a different conclusion. All of it was so obviously in the exclusive interest of the plaintiff, and so unfair in favorably affecting that interest of the plaintiff to the damage of this defendant, that it seems to us something more was required of the plaintiff than to stand passive and mute, thereby reaping the fruits of this unfairness, without carrying any of the responsibility for its continued exploitation. The newspaper propaganda of the customarily sensational and lurid type, when an incident in litigation is taken up and expanded into what avid reporters call a story, in terms and in quotation marks directly involved the president of the plaintiff, Hopkins himself, and plaintiff's counsel as authorities. Whether or not this was justified, the notoriety thereof demanded of Hopkins and through Hopkins his company, the plaintiff, of which he was president, something in the nature of a disclaimer.

But there is also direct proof here of plaintiff's responsibility for some of this unfair competition. Some of defendant's customers received warning letters from plaintiff. In one notorious instance, the Binks label, the authorship is directly attributable to the plaintiff's representatives. Immediately after the first decision in the California District Court, in the fall of 1925, Hopkins, as president of the Alliance Securities Company, authorized customers of the latter to use a warning notice, substantially as follows:

"*Warning.*—Our pressure paint contain-ers are licensed under the Hopkins patent, No. 1,196,691, dated August 29, 1926. Therefore, any and all pressure paint containers no matter by whom purchased which have one or two regulating valves with two lines of hose to air gun, unless same have been licensed under the Hopkins patent, they are an infringement, and the manufacturer, user, or seller is subject to prosecution."

The Binks Spray Equipment Company of Chicago, among others, was encouraged and justified to use a warning of this character displayed upon its productions, and, in addition, the president of this company testified in this case that Mr. Hopkins gave him the wording that went into the label. There was testimony also to the effect that the newspaper articles which, as we have said, were lurid in their depiction of the great and comprehensive victory obtained by Hopkins in the sustaining of his patent, were inspired to some substantial degree at least by the counsel of plaintiff in those cases, and that the Binks Company was encouraged by plaintiff to make use of these articles as faithful accounts of the scope of the Hopkins "victory." One reporter, who prepared an article, stated that he obtained some information entering into its composition from Hopkins himself. The evidence shows us also that Hopkins made statements to the trade, saying to Mr. Green, of the firm Lacer & Green, consenting to a decree, that his patent covered anything in the line of a five-gallon paint pot, where the paint was forced out of the pot under air pressure. To another party, representing Essick & Co., Mr. Hopkins is alleged to have said that his victory would put the De Vilbiss Company entirely out of business; and that the De Vilbiss apparatus, which his company was selling, and which was of types known here as Exhibits 2 and 3, were infringements of the Hopkins patent. Other dealers and salesmen testify substantially to the same effect, and, to the extent which their business, and through them that of the defendant here, was affected. There is much testimony respecting the direct effort of the plaintiff to take advantage of these manifestly unfair representations.

This conduct of plaintiff is of itself sufficient to raise a very serious doubt whether it is qualified to enter a court of equity affirmatively against defendant with a demand for accounting, as already suggested. It is also, in our judgment, a sufficient basis for an action for damages by defendant against it; the parties being here and the issue of damages having been properly set

up in defendant's counterclaim. The law on this subject is well settled. Universally an injunction is allowed to prevent further impositions of precisely the character complained of here, and, on principle, what will sustain an injunctional decree against repetitions of past transactions will justify assessment of damages already sustained, if the inhibited practices have substantially injured the complaining party. Dittgen v. Racine Paper Goods Co. (C. C.) 164 F. 85; Gerosa et al. v. Apco Mfg. Co. (C. C. A.) 299 F. 19; Frink, Inc., v. Erickson (D. C.) 16 F. (2d) 496. Cases in which injunctions have been allowed against misrepresentations of the scope of a patent adjudication are numerous and are cited in decisions here referred to. In Asbestos Shingle Co. v. H. W. Johns-Manville Co. (C. C.) 189 F. 611, Judge Hand said (page 615):

"None of the cases * * * seem to raise the precise facts here at bar, but I take it there can be no question that a trade injury is actionable when it arises from actual misstatements."

It is not material whether the misleading and destructive propaganda were maliciously instituted or the product of mere bad judgment. The gauge is whether injury to defendant followed proximately therefrom. On this there is ample proof.

Defendant may have an order for accounting on its counterclaim. Plaintiff's bill is dismissed.