**HOWE v. ATWOOD et al.**

No. 2682.

District Court, E. D. Michigan, S. D.

Oct. 7, 1942.

982

Alex J. Groesbeck and Lawrence Rothenberg, both of Detroit, Mich. (Clarence B. Zewadski, of Detroit, Mich., of counsel), for plaintiff.

Beaumont, Smith & Harris, and Albert E. Meder and Richard W. Larwin, all of Detroit, Mich. (Andrew F. Wintercorn, of Rockford, Ill., of counsel), for defendants.

PICARD, District Judge.

The chronological history becomes important.

March 15th, 1937, plaintiff filed application for United States letters patent, No. 130977, entitled "Hinge Mechanism" and covering a practical concealed hinge for supporting a curved door to a curved automobile body. During that year he submitted his ideas to the several companies making hinges for Ford, Chrysler, General Motors and for other independent automobile concerns. He showed defendant Seth B. Atwood, manager of defendant the Atwood Vacuum Machine Company, his application including requested claims, but defendants were not interested. Later application No. 130977 was abandoned because of the death of plaintiff's patent attorney but the identical application was refiled January 14th, 1938, for which plaintiff on June 20th, 1939, received letters patent No. 2163323 (hereinafter referred to as 323 or Patent No. 1).

March 16th, 1938, plaintiff entered into an option agreement with Metal Specialty Company of Cincinnati, Ohio, by the terms of which Metal Specialty had the right to become licensed under Howe's ideas covered by the terms of a proposed license agreement which was attached to the option. This option was exercised and the license agreement executed May 24th, 1939, by which plaintiff granted Metal Specialty exclusive license to manufacture, sell and use the inventions evidenced by then numbered application 130977, all continuations and substitutions therefor, all divisions thereof, and under any and all patents and reissues thereof which licensor might apply for and obtain or otherwise acquire in concealed hinges and body arrangements, during the life of the agreement. Patent No. 2 herein later mentioned was applied for during the option period and became a part of the license. Licensee agreed to pay plaintiff 5 percent of the sales price received by it for hinges sold pursuant to the contract and licensee had the right to grant sub-licenses, a royalty of 5 percent of the sale price received from such sub-licensees to be collected by licensee and paid to licensor.

Plaintiff and Metal Specialty sought to interest many automobile and body building companies in patent 323. During 1938 they showed plaintiff's hinge to Studebaker, General Motors, Ford, Chrysler, Nash, Budd, Packard, Fisher Body and gave evidence that at the same time they showed a compensating angle or inclined pin hinge construction which Howe stated he had conceived and put on a blue print as far back as August 23rd, 1937. He produced this blue print.

In May, 1938, Howe prepared a model showing the inclined pin hinge which he also demonstrated during the same year to several automobile and body companies.

May 10th, 1938, Howe was given a hinge layout by a Mr. Sullivan, engineer for Studebaker, and on the 19th gave that engineer a drawing showing the inclined pin.

On January 9th, 1939, plaintiff filed his application for his second hinge with the inclined pin, and on May 21st, 1940, received letters patent No. 2,201,490 (hereinafter referred to as 490 or Patent No. 2).

Of all companies approached, Packard seemed to be the most interested in the Howe hinge and Packard was one of defendant company's customers. While patents were pending conferences were held between Metal Specialty Company, plaintiff and defendant company during which the subject matter contained in the applications and possible coverage to be obtained were discussed.

April 19th, 1939, less than four months after plaintiff had made application for his inclined pin hinge, a contract was entered into between Metal Specialty and Atwood Vacuum by which they were both to make hinges covered by the patents applied for (323 and 490) and to divide "the production and profit" "equally between them". Atwood Vacuum was to pay Metal Special-

ty $1,000.00 upon signing the contract and an additional $1,000.00 after satisfactory claims had been allowed. Atwood Vacuum was also to pay Metal Specialty 5 percent of the sales price on hinges until an additional sum of $4,000.00 was paid. This was to equalize development expenses. It was further provided that payment of the 5 percent royalty on hinges sold and manufactured by Atwood Vacuum be paid direct to plaintiff and this was a different arrangement than plaintiff had with Metal Specialty. Plaintiff approved and consented to this agreement in writing. In other words, plaintiff agreed to look to Atwood Vacuum for royalties on his hinges sold by defendant company and in that contract Atwood Vacuum agreed not to contest "directly or indirectly or in any way encourage or lend assistance to anyone intending or attempting to contest the validity of the patents licensed thereunder."

Atwood Vacuum agreed to aid in securing the claims and did make one or two helpful suggestions.

Atwood Vacuum then paid $2,000.00 to Metal Specialty Company "in equalization of the development expenses up to date".

Shortly thereafter Metal Specialty complained that certain hinges which it felt came within the scope of the above agreement on both patents were being made by Atwood Vacuum for Studebaker and asked Atwood Vacuum to account for royalties and excess profits. In reply defendant company claimed the hinge it had sold Studebaker did not infringe the Howe patents and several letters were exchanged between the parties, defendants warning Metal Specialty that the validity of their joint patents might be challenged by the big automobile companies if it insisted upon pushing the matter. Later, May 24th, 1940, Metal Specialty Company notified defendant company that it was terminating the April, 1939, contract at the end of 30 days but Atwood Vacuum prevailed upon it to reconsider and talks were had without any further action on the termination. However, upon continued refusal of defendant company to pay royalties to Howe and to divide the production and profits, Metal Specialty Company, September 24th, 1940, assigned all its rights, title and interest in and to said April 19th, 1939, agreement to plaintiff and was released by plaintiff from further obligation, Metal Specialty notifying defendant company of its action October 1st, 1940.

October 3rd, 1940, defendant company acknowledged receipt of that assignment asking in reply whether "any further work that we may have to do would then be done with Howe?"

October 8th, 1940, Metal Specialty wrote defendants "so any further work that you have to do should be done with Earl Howe".

January 9th, 1941, three months later, defendants notified Metal Specialty Company that they considered Metal Specialty's action in assigning their contract to plaintiff, a breach of the April 19th, 1939, agreement, absolutely of no force or effect, and demanding return of the $2,000.00 they had paid.

On March 5th, 1941, Howe started suit against defendants in the Wayne County Circuit Court under the license agreement for royalties and as assignee of Metal Specialty for the agreed sum of $4,000.00 and excess profits, and service was made on defendants March 18th, 1941.

March 21st, 1941, after suit and service, more than five months after first being notified of the assignment to Howe and more than two months after repudiating that assignment, defendant company wrote Earl E. Howe "We do not consider ourselves a licensee and that so far as we were concerned we had no interest whatever in the patents which you controlled. This letter will serve legal notice that we are not a licensee under Howe patents on hinges as covered on the original contract between yourselves and Metal Specialty Company."

Defendants immediately removed the cause to this court, whereupon plaintiff filed an amended bill adding prayers to hold defendants as infringers; to enjoin defendants from manufacturing further hinges covered by plaintiff's patents 323 and 490, and asking that defendants be directed to account and pay plaintiff all sums found due him on account of breach of the contract of April 19th, 1939.

### The Issues Involved.

Several questions are presented:

#### First Question.

The first for this court to decide is whether plaintiff may maintain an action on the April 19th, 1939, contract, for royalties.

Metal Specialty Company admittedly was not then manufacturing hinges of any kind

while Atwood Vacuum was well known in this line. Atwood Vacuum, interested in the Howe hinge because one of its clients, Packard, was interested, learned it had to do business with Metal Specialty. It was not necessary under the license granted Metal Specialty for Howe to become party to any contract of sub-license but evidently as a precaution for all parties, the arrangement between Metal Specialty and Howe was modified to the extent that Atwood Vacuum was to make payments direct to Howe. Thus the contract became a three party agreement and it is the opinion of this court that this arrangement not only served Howe's purpose well but it was also of value to Atwood Vacuum in the event that some difficulties arose later between itself and Metal Specialty. This contract being participated in by Howe gave the Atwood company a hold upon Howe it otherwise would not have had.

It will also be noted that when Metal Specialty informed defendant in October of its assignment to Howe, defendants then replied that they understood they must henceforth do business with Howe. It took defendants three months before notifying Metal Specialty that they questioned Metal's right to make any such assignment and five months to apprise Howe of their claimed status of non-licensee. And then only after plaintiff had brought suit and defendants had been served.

■ Approaching this from the opposite angle we believe that if plaintiff had refused to go on with this contract while defendants had lived up to their obligations, defendants certainly could have resorted to action on this agreement and gotten favorable results. But for reasons best known to themselves, in March, 1941, they chose to strike the shackles by which their company was encumbered under the terms of that agreement. This contract was plain and unambiguous and leaves no reason for strained construction. Defendants should not therefore be permitted to show an intent contrary to its express provisions. As stated in Golden Gate Bridge & Highway District v. United States, 9 Cir., 125 F.2d 872, 876, "the cardinal rule of construction is to ascertain and give effect to the intention expressed in the instrument which is being construed" citing 12 Am.Jur., Contracts, § 227. See, also, Harrington v. Interstate Business Men's Association, 210 Mich. 327, 178 N.W. 19. To this court it appears that all three were

parties to that agreement and that plaintiff may now maintain this action for royalties.

The date of "cancellation" of that contract, however—if cancelled—will be discussed later.

## Second Question.

We come now to the second issue, to-wit:

May defendants question the validity of these patents in a suit for royalties?

■ It is admitted that the Federal Court has exclusive jurisdiction of infringement of patents, 28 U.S.C.A. § 371, Fifth, and that this was originally a suit for royalties and not for infringement. Does removal to the Federal Court enlarge the scope of the justiciable issues so that validity of the patents may now be attacked? We think this is answered in a very recent decision, Noma Electric Corporation v. Polaroid Corporation from the Southern District of New York, 2 F.R.D. 454, decided May 22, 1942, where the court stated: "If the state courts lacked jurisdiction over the subject matter of the action, the federal courts cannot acquire jurisdiction as the result of the removal, although it might have had jurisdiction if the action had originally been commenced in the federal court".

In State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 295, 83 L.Ed. 235, Mr. Justice Brandeis says: "If Congress did not grant permission to bring this condemnation proceeding in a state court, the federal court was without jurisdiction upon its removal. For jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. Where the state court lacks jurisdiction of the subject matter or of the parties, the federal court acquires none, although in a like suit originally brought in a federal court it would have had jurisdiction."

■ Here, however, plaintiff amended his own bill of complaint asking injunction against further infringement. May he not then voluntarily enlarge the scope of the jurisdiction? The answer we believe is correctly given above and in De Lima v. Bidwell, 182 U.S. 1, 174, 21 S.Ct. 743, 744, 45 L.Ed. 1041, where the court states: "Defendant neither gains nor loses by the removal, and the case proceeds as if no such removal had taken place."

Both State of Minnesota v. United States and Noma Electric Corporation v. Polaroid Corporation, supra, were decided subsequent to adoption of the new civil rules, so it is apparent that those rules neither extended nor limited jurisdiction of the district court. In fact, they so provide, Rule 82, 28 U.S.C.A. following section 723c.

■ Therefore, insofar as these defendants are concerned, the question is not "Are plaintiff's patents good" but, first, just what is the proper construction of the patent issued plaintiff, and second, has defendant company made and sold a hinge that bears more closely upon the patented article than it does upon the prior art? Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 99 F.2d 1; Casco Products Corp. v. Sinko Tool & Mfg. Co., 7 Cir., 116 F.2d 119, 121.

■ In short, if defendant company is manufacturing substantially the hinge covered by plaintiff's patent which in turn is not covered by the prior art, then regardless of the validity of plaintiff's patent, defendants must pay royalties and as licensees are estopped from questioning the validity of patents under which they are licensed while this contract remained in full force and effect. Not only do defendants so specifically agree in their contract but the weight of authority is overwhelming. Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 99 F.2d 1; Motor Wheel Corp. v. Rubsam Corp., 6 Cir., 92 F.2d 129.

■ And it has been held that even though the claims are given the narrowest construction possible and even though the devices are changed to some extent, if they remain the equivalent of the invention, that is if they perform substantially the same function in substantially the same way to obtain the same results, there is infringement. Baldwin Rubber Co. v. Paine & Williams Co., supra; Motor Wheel Corp. v. Rubsam Corp., supra; General Tire & Rubber Co. v. Fisk Rubber Corp., 6 Cir., 104 F.2d 740.

### Third Question.

The third question—Is plaintiff entitled to recover under his patent 323 for hinges manufactured and sold by defendants to the Studebaker Company which defendants claim are covered entirely by the prior art?

The evidence shows that when application was made for patent 323 petitioner, plaintiff here, had to elect whether he was asking a patent on a hinge per se or whether it was a type of hinge in combination with the door of an automobile.

Plaintiff's patent mechanism is known as a concealed hinge, that is it cannot be seen from outside the car. It was designed to be placed about halfway the height of the door and was limited in length, the top of the hinge being about the lower most edge of the door window, and the bottom substantially above the lower edge of the door. It had one pintle. It was one hinge. And when petitioner was confronted with a similar hinge covered by Citrain British 8460 but having two pintles, he contended that while his was a "unitary" type hinge with a "single" pintle, the Citrain British device was a "duplex unitary" hinge with "two" pintles. Since both Citrain British and Howe's hinge worked on a fixed axis he differentiated between the two only on the theory that his hinge with a single pintle was superior to the Citrain British hinge because it would not get out of alignment. He insisted that any hinge having two pintles (Citrain 8460) was the complete equivalent of two hinges and would not have the advantage of a single hinge, specifically adding that "any attempt to align the door after hanging (with the Citrain British 8460) will result in throwing the pins out of line and thus a major and essential advantage of applicant's hinge will be lost." Words in parenthesis added.

■ Thus, he defined to the examiner the advantage of his hinge over the upper half of the Citrain hinge. This is important because by the file wrapper and by what took place before the examiner we can determine on what distinction applicant was asking to receive his patent. Alliance Securities Co. v. De Vilbiss Co., D.C.Ohio, 24 F.2d 530, 532; Jones et al. v. General Fireproofing Co., 6 Cir., 254 F. 97, 101; Grever v. United States Hoffman Co. et al., 6 Cir., 202 F. 923, 926; Banning v. Sears, Roebuck & Co., 6 Cir., 88 F.2d 45, 47; Wiegand v. Bingham Co., 6 Cir., 106 F.2d 546, 548.

There is no denying that plaintiff has claims to what was known as a combination of hinge, door and body in his first patent and he so elected. Then when he revamped

his application and accompanying claims he was confronted by Citrain French patent 446509, also a duplex unitary hinge. This time applicant differentiated between his mechanism and that of the Citrain French patent and Swallow British patent 462033, cited by the examiner, to explain that his hinge worked on a "fixed axis" —that is the pintle did not move, while in both the Citrain French and Swallow British patent cited, the hinge pin did move as the door was opened and closed.

One cannot read plaintiff's claims and history of his first patent without reaching the conclusion that applicant claimed nothing more than a concealed hinge having a single pin, of limited length, placed at a certain part of a curved automobile door with the top of the hinge about even with the window line. It was strictly a one pintle hinge—the sole distinction advanced by him between it and the Citrain British patent and undoubtedly the only reason the Citrain British hinge was not further considered by the examiner was that Howe when he revamped his application voluntarily limited his claims to a unitary single pintle hinge. This is the more apparent by his resorting to the distinction of a "fixed axis" between his hinge and the Citrain French and Swallow British patents when he reappeared before the examiner with his new claims.

■ These two patents long antedated the Howe patent. The mechanism made by defendant company on which royalties are now demanded based on patent number one is practically an exact reproduction of the top Citrain British hinge. It has two hinge pins, a fixed axis and is concealed. It never was the intent of the examiner in our opinion to give plaintiff a patent on the duplex unitary hinge nor did plaintiff ever claim it. In view of the above it should not be so construed. Anybody can make that Citrain hinge now without infringement and there was no infringement by defendants in selling Studebaker the hinge known as Exhibit 8. The mechanism was entirely covered by the prior art and so plaintiff is not entitled to royalties on his first patent. Casco Products Corp. v. Sinko Tool & Mfg. Co., supra.

### Fourth Question.

The next question relates to the second or "inclined Hinge" patent, which in general details is the same as the location or combination hinge except that patent 490 is

a hinge with an inclined axis and an inclined pintle. But here we must approach the issue from two separate angles because plaintiff claims that defendants made and sold a duplex unitary hinge that was practically a duplicate of Howe hinge 490 and then made and sold a second type of hinge which, in effect, was half of its duplex unitary hinge or the Howe hinge cut into two parts and designated by plaintiff as a single type hinge. This smaller or single type hinge was to be placed near the top of the car door and some other type hinge at the bottom—but wherever the accused hinge was used it aimed to give the same results with the same mechanism and in the same manner as the second Howe hinge.

The claims of plaintiff's patent No. 2 define a hinge per se. That is, it is a certain type hinge of itself. True, it's primarily a hinge to be used on a car door and illustrations all relate to automobiles, but it is the understanding of this court that the secret of the claims of the second hinge lies in the fact that the inclination of the axis inwardly from the car door and longitudinally towards the front of the car is accomplished by the use of an inclined pintle built into the hinge, this inclination being compensated for by using a goose-neck hinge member varying the extent of its curvature from top to bottom.

The evidence shows that even in the old style cars before streamline bodies, car doors were never always accurately aligned and fitted but had to be "persuaded" or "jimmied" into place. This was nothing new and was accepted by auto body manufacturers—the "persuasion" often bending the hinge so as to get the door into proper alignment. However, with the advent of the new style streamline bodies "persuasion" alone was out of possibilities. In addition it was desirous of having a door that would open parallel to the ground and at a certain angle would reach a neutral position where it would not fall back quickly striking the person about to enter the car, or fall forward towards the fender. To achieve this result manufacturers began shaping the pillar of the door so that when the common straight vertical pintle hinge was affixed it slanted inwardly and longitudinally—the Cord car of 1936, for example. Results were not entirely satisfactory and some persuasion was still necessary.

Plaintiff contends that he solved the problem. His claim is that he conceived the type of hinge that eliminated the neces-

sity of modifying the pillar which still by "persuasion" had to be twisted so that alignment could be made. Howe's second hinge, he says accomplished this without "persuasion".

It is not denied that defendants also knew the problem that had become exaggerated by the new streamline bodies when they entered into this contract and that they agreed to participate in helping to get the second patent with the claims based upon an inclined pintle and an inclined axis. Defendant company's manager, Atwood, had seen the drawings and what Howe claimed. But Atwood Vacuum, nevertheless, started making an inclined pintle hinge of a duplex unitary type practically exactly like the Howe hinge but having two pintles instead of one. Later it made a single type hinge to go at the top of the door and to be used with some other type hinge near the bottom but with the axis inclined and the pintle in each hinge also inclined.

Let us first discuss the duplex unitary hinge.

■ Defendants' claim simply is that Howe's patent merely covers a single pintle and that the examiner having had experience with the first Howe hinge knew Howe was claiming on a single hinge. Furthermore defendants allege that the claims of the second patent as written particularly emphasize that it was a single pintle and not two. But each patent is a separate contract with the government and what Howe said in securing his first patent should not be held against him in getting a patent on an entirely different hinge. Deitel v. Unique Specialty Corp., 2 Cir., 54 F.2d 359, 360; Lewis Blind-Stitch Mach. Co. v. Arbetter Felling Mach. Co., D.C., 208 F. 992.

■ However, what is more important is that the drawing accompanying the second Howe hinge shows how it could be utilized with two pintles as well as one, and incidentally one of the arguments used by defendants in limiting Howe's first patent was that his drawings did not cover a duplex (two pintle) hinge. But Howe's drawing in the second patent did—and the drawings accompanying a patent with its claims are illuminating when the question of prior art and intended coverage is at issue. Wadsworth Electric Mfg. Co., Inc., v. Westinghouse Electric & Mfg. Co., 6 Cir., 71 F.2d 850, 852; Whitin Mach. Works v. Houghton, 1 Cir., 178 F. 444.

Defendants then produced Smith patent No. 2050469 which is also a concealed hinge mechanism for a car door where the axis of the hinge is inclined, there being two separate hinges—one at the top and one at the bottom of the car door, the hinge itself being a ball and socket arrangement. They insist that as owner of the Smith patent they had the first inclined axis theory so that plaintiff cannot claim this feature of his hinge as being new and that since the "pintle" is old in the art this was not sufficiently distinguishable from the ball and socket mechanism to be patentable.

However, using the same theory to acquaint ourselves with the scope of the Smith patent as we did in determining the scope of Howe's No. 1. hinge, we find the following significant wording used as part of the Smith patent: "It is common practice to use hinges of the pintle type in mounting the doors on vehicle bodies, *but such hinges require the pintles to be in alignment, and on the modern vehicle bodies that usually means one or more of the hinges must extend laterally outward beyond the surface of the body to such an extent as to afford considerable air resistance to the rapid transit of the vehicle.*" (Italics ours.)

Thus we find the Smith patent distinguishing its "ball and socket" feature on an inclined axis as accomplishing a result not obtainable by "pintles" and insisting that pintles could not be used on the new doors without at lease one or more of the hinges being exposed and adding that alignment was difficult. In practice, however, defendants found that their own Smith hinge was not feasible because the Smith ball and socket arrangement would not support a heavy car door and discontinued its manufacture.

We do not question that the Smith patent was a pioneer in the inclined axis hinge type but there is more to the Howe hinge than an inclined axis. The pintles themselves are inclined. Even in the drawing accompanying the second hinge in which there are two pintles, both the top and bottom pintles are inclined in complete alignment. The claims are all specifically based on an inclined pintle built into the hinge and Claims 3 and 4 are additionally based on a goose-neck hinge member of substantial curvature varying the extent of curvature from top to bottom to compensate for the inclination of the pintle.

■ Defendants have failed to show any inclined pintle as part of any hinge for automobile doors in the prior art and even without the drawing showing a duplex unitary hinge (which plaintiff does show in patent No. 2) if, when slight changes or deviations from the patented article have been made, the new device still uses the same mechanism to obtain the same results, the licensor can collect on his contract after the prior art has not disclosed a device of the same type. Baldwin Rubber Co. v. Paine & Williams Co., supra; General Tire & Rubber Co. v. Fisk Rubber Corp., supra.

■ To this court it is apparent that the duplex unitary hinge with the inclined pintles made and sold by defendants is practically a duplicate of the hinge shown by the duplex unitary hinge drawing appearing in Howe's second patent and the same to all intents and purposes as the unitary hinge with one pintle of that same patent. And this court holds that the examiner and the government intended to give plaintiff a patent covering a hinge having a goose-neck type hinge member with an inclined axis and an inclined pintle. Therefore we find that even if defendants made and sold only half of the duplex hinge or only part of plaintiff's hinge, under the facts of this case plaintiff can recover for such hinges also meet all of the terms in the claims of the second patent. Dowagiac Mfg. Co. v. Superior Drill Co., 6 Cir., 115 F. 886.

■ There was some evidence that General Motors had a drawing back in November, 1937, showing the inclined axis and evidently the inclined pintle, but Howe countered by presenting a previous drawing of the same year. The testimony of neither party is extremely convincing on this point. But General Motors' hinge was not proven to be more than an experimental drawing and the hinge never was used or known to the public prior to Howe's invention. Furthermore the evidence submitted does not satisfy the rule that prior knowledge or use of an invention must be proved beyond a reasonable doubt, or, by substantially such certainty. Westinghouse Elec. & Mfg. Co. v. Wadsworth Elec. Mfg. Co., 6 Cir., 51 F.2d 447, 449; Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co. (In re Barbed Wire Patent), 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Eibel Co. v. Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523.

There is also some evidence that the double inclination principle was in the 1937 Chevrolet car, the first showing of which was made in 1935. In fact, defendants claim that thousands of cars embodying the Howe patent were on the streets in 1937 except that the body tumbled out instead of in. But another distinction was that the hinges were exposed. Here the hinges are concealed and of the gooseneck type, undoubtedly patentable in itself. We believe it is fair to assume that if this idea was so prevalent in 1938 defendants should have known about it. Atwood vacuum was in the hinge business and we cannot understand their interest in plaintiff's hinge in 1939-40, particularly their desire to insure the proper scope of the claims, if such a hinge was already on the market.

■ But in any event, did General Motors have a like mechanism? This would be a question of validity pure and simple, and does not release defendants from their obligation. Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 99 F.2d 1.

For those hinges furnished by defendants, plaintiff may recover.

As to installations where two separate hinges are used, one at the top and one at the bottom, defendants contend that here again the file wrapper should be taken into consideration and that plaintiff stated before the examiner that claim 4, which defendants insist is the only claim under which this double hinge could be read, differed from claim one only because there was a single inclination. This, we believe, to be without merit.

■ These cases are authority for the liberality of interpreting claim coverage when apparently limited by argumentative statements before the examiner. Kellogg Switchboard & Supply Co. v. Michigan Bell Telephone Co., D.C.Mich., 5 F.Supp. 118; Byers Machine Co. v. Keystone Driller Co., 6 Cir., 44 F.2d 283, 284; Parker Rust Proof Co. v. Ford Motor Co., D.C.Mich., 6 F.2d 649, 657.

Claim four reads as follows: "4. Means adapted to support the door of an automobile body curved in transverse section comprising a concealed hinge, said concealed hinge comprising a hinge plate, a goose-neck type hinge member of substantial curvature connected directly to said hinge plate, the axis of the connection being at an inclination to the vertical as required

by the curvature of the automobile body, said hinge member' varying the extent of its curvature from top to bottom thereof in an amount sufficient to substantially compensate the inclination of said axis whereby a door carried by said hinge member swings through a substantially horizontal arc."

 In addition, in our opinion the Atwood single type hinge, when used with one or more additional hinges, is readable upon the first three claims of patent 490 and without the claimed limitation of the file wrapper, claim No. 4 specifically covers the accused hinge in such an installation. Since we hold that plaintiff's claims are not limited, plaintiff can recover under Copeman Laboratories v. General Motors Corp., D.C., 36 F.Supp. 755. The rights of the plaintiff should be broadly accepted and in the case at bar where is there any evidence of a hinge or hinges under any other patent or prior art which embodies the Howe inclined pintle and axis hinge type? We find none.

 It is our holding that where there were hinges with the pintles inclined and aligned on an inclined axis fitted upon a door or in a depression of the door pillar to obtain results of the Howe patent made and sold by defendant, plaintiff may recover. This we hold whether in a duplex unitary type or in a single type hinge.

We repeat that we are not passing upon the validity of the plaintiff's patents but defendants in our opinion have manufactured and sold these infringing hinges for use on automobiles made by the following companies: Studebaker Corporation, Chrysler Corporation, and Nash-Kelvinator Corporation; that they are based fundamentally upon Howe patent No. 2 and for these plaintiff can recover.

### Fifth Question.

 Defendants claim further that under no circumstances can they be held for royalties when they did not make or sell the hinges for any particular purpose and that if there has been infringement it has been by automobile companies utilizing these hinges.

We believe that this defense is also without merit. Certainly defendants knew for what these hinges were to be' used. Atwood Vacuum was making hinges for automobile car doors—not for house doors, and it participated and gave first impetus to whatever infringement there might have been. Canda v. Michigan Malleable Iron Co., 6 Cir., 124 F. 486; General Electric Co. v. Sutter et al., C.C., 186 F. 637; Elevator Appliance Co. v. Brooks, 2 Cir., 101 F.2d 703.

### Sixth Question.

The next question presented is to decide the effect of the assignment of September 24th, 1940. Defendants contend that the assignment is void and of no force and effect and cites authorities that a licensee cannot assign a license agreement without the contract expressly providing for assignment. The assignment here is by the licensor rather than the licensee. However, this court has already held that plaintiff may maintain this action as to royalties on the broader grounds, namely, that plaintiff, by consenting to the contract between Metal Specialty and Atwood Vacuum, became bound thereby as licensor and entitled to royalties from defendants as licensor. Therefore whether plaintiff is entitled to maintain an action on the assignment as to monies due Metal Specialty which had accrued to the date of the assignment and whether plaintiff can maintain an action for damages for profits made after the date of the assignment must be determined.

In this connection it might be well to note that Atwood Vacuum upon receiving the assignment of September 24th, 1940, recognized in its letter of October 3rd, 1940, that it must henceforth do business with Howe.

 Plaintiff claims that as assignee he is entitled to excess profits as defined in the agreement and 5 percent of the sales price of hinges not to exceed $4,000.00 which accrued to September 24th, 1940, and also damages for breach of contract for failure to divide the production and profits. This court holds first, that plaintiff is entitled to maintain an action on the assignment as to any money which had already become due to Metal Specialty from Atwood Vacuum under the contract up to September 24th, 1940. Rodgers v. Torrent, 111 Mich. 680, 70 N.W. 335; and second, that he is not entitled to maintain an action for damages for profits made after the date of the assignment.

This court having decided that certain of the hinges made by Atwood Vacuum came within the scope of the agreement, defendants' actions in refusing to recognize their obligations to divide the production was an abandonment of the arrange-

ment to divide the hinge production and that the assignment of September 24th, 1940, was in effect an acceptance of the abandonment of the arrangement to divide production, precluding Howe from collecting damages for failure to divide the production accruing after September 24th, 1940.

### Seventh Question.

 Reverting, in conclusion, to the question of the termination of this contract, we hold that royalties can be collected only up to the day of cancellation. As stated in Eskimo Pie Corp. v. National Ice Cream Co., D.C., 20 F.2d 1003, 1005 "plaintiff is entitled to an accounting, to determine what royalty, if any, had accrued under its license up to the date of its cancellation, and to recover such amount, and as to this claim the defendant is estopped to plead the invalidity of the patent. From the date of the cancellation of the license contract the defendant is to be treated as any other infringer, subject to the same liabilities and entitled to the same defenses as any other infringer, unless it be held that the agreement in the license not to contest the validity of the patent continues in force after the contract has by the conduct of the parties been terminated."

Metal Specialty had the right to cancel the April 19th, 1939, contract in event of default by Atwood Vacuum by giving thirty days' notice. This court has held that the arrangement between Atwood Vacuum and Metal Specialty to divide the hinge business was terminated by the assignment of September 24th, 1940. It was acquiesced in by Howe by the acceptance by him of the assignment. It is the opinion of this court that under the facts in this case Atwood Vacuum would have the right, after September 24th, 1940, to cancel the licensing arrangement upon giving Howe thirty days' notice, under the law of mutuality of contracts. Wilkinson v. Heavenrich, 58 Mich. 574, 26 N.W. 139, 55 Am.Rep. 708.

We therefore believe that plaintiff is entitled to recover for hinges made and sold by defendants up to a point thirty days after defendants' letter of March 21st, 1941. In other words, from then on plaintiff must seek any redress he may claim by infringement and he cannot here recover royalties on the license agreement after that day.

We further believe that plaintiff is entitled to recover excess profits as de-

fined in the April 19th, 1939, contract to September 24th, 1940, and 5 percent of the sales price, but not to exceed $4,000.00 on hinges sold by Atwood Vacuum prior to September 24th, 1940, as assignee of Metal Specialty, but that he cannot recover excess profits after September 24th, 1940.

An accounting between the parties will be made in accordance with this opinion and if unable to reach an agreement on the number and the amount the matter will be referred by this court to a master for the taking of testimony.

Defendants' counterclaims for damages caused by the garnishment proceedings, brought simultaneously at institution of suit and for wrongful termination of the license contract between Metal Specialty Company and Atwood by the assignment of September 24th, 1940, are hereby dismissed—no damages having been shown.

An order in conformity with this opinion may be submitted to the court for its signature.